## SWORDS v. PAGE.

(Circuit Court of Appeals, Eighth Circuit. November 26, 1909.)

No. 2,910.

1. TRIAL (§ 169*)—DIRECTION OF VERDICT—INSUFFICIENCY OF EVIDENCE.

The direction of a verdict for a defendant is proper if, considering all of the evidence and the inferences which might naturally and logically be drawn therefrom, there is not sufficient to sustain a verdict in favor of the plaintiff, and the court in the exercise of a sound judicial discretion would feel impelled to set aside such a verdict if returned.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 341, 381–387, 389; Dec. Dig. § 169.*]

2. BANKS AND BANKING (§ 287*)—NATIONAL BANKS—ACTION BY RECEIVER—SUFFICIENCY OF EVIDENCE.

In an action by the receiver of an insolvent national bank against a former stockholder and director to recover the price he received for shares of stock which it was alleged he sold to the cashier and received payment from funds of the bank, evidence considered, and *held* insufficient to charge defendant with notice either that the stock was bought by the cashier or paid for with funds of the bank, if such was the fact; it appearing that he delivered the stock on a contract signed by the cashier as agent for another director, and that the greater part was paid for by such director to whom it was transferred, and who received dividends thereon.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 287.*]

In Error to the Circuit Court of the United States for the District of North Dakota.

Action by G. W. Swords, receiver of the Minot National Bank, against E. B. Page. Judgment for defendant, and plaintiff brings error. Affirmed.

Tracy R. Bangs, for plaintiff in error.

George A. Bangs, for defendant in error.

Before SANBORN, Circuit Judge, and CARLAND and POLLOCK, District Judges.

POLLOCK, District Judge. This action was brought by the receiver of the Minot National Bank of Minot, N. D. (hereinafter called the "Bank"), to recover from defendant, E. B. Page, the sum of $2,500, and interest thereon; it being alleged in the petition, and claimed by the receiver, this sum of money had theretofore been wrongfully and illegally paid out of the funds of the Bank by its cashier, J. A. Erickson, to defendant as the purchase price of 20 shares of the capital stock of the Bank, at an agreed price of $2,500, such payment being evidenced by a draft for $500 drawn by Erickson in favor of defendant, October 18, 1904, on the First National Bank of Minneapolis, Minn., and by that bank paid to defendant by a draft for $1,896 drawn in the same manner on November 14, 1904, and paid to defendant, the remaining sum of $104 being the value of certain articles of furniture theretofore purchased by the defendant from the Bank.

The facts in the case necessary to decision may be briefly summarized, as follows:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The Bank was first organized as a state bank, thereafter reorganized as a national bank with a capital of $50,000. In the spring of 1904 this capital was reduced to the sum of $25,000. One J. A. Erickson was cashier of the Bank. Defendant Page, who resided at Leeds, a town about 90 miles east of Minot on the line of the Great Northern Railway, was president of the First National Bank of that place, a stockholder in the Bank, owning 65 shares, and a member of its board of directors. His friends, Hull and Hackett, of the state of Wisconsin, were each the owner of 5 shares, and Noltimier and Studness, also his friends, of Church's Ferry, a town on the Great Northern Railway east of Minot, were each the owner of 30 shares, all purchased through Erickson, and aggregating 135 shares; the same being a controlling interest in the Bank. Defendant had engaged with his friends to visit the Bank as frequently as his business interests would permit for the purpose of keeping himself advised in regard to the affairs of the Bank. The price at which the shares had been purchased after the reduction of the capital stock of the Bank was at a premium of about 6 per cent. One C. H. Parker, a citizen of Minot, a man of means, proprietor of the Leland Hotel at that place, the owner of 10 shares of the capital stock of the Bank, and a member of its board of directors, in the latter part of September, or the first of October, 1904, being desirous of purchasing further shares in the Bank, accompanied Erickson, the cashier, to Church's Ferry for the purpose of negotiating the purchase of shares held by Noltimier or Studness. On the 18th day of October, 1904, defendant while on a visit to the Bank, for the purpose of keeping himself familiar with its business affairs, for the benefit of himself and his associates, after some negotiations, entered into the following agreement for the sale of his shares and the shares of his associates to Parker through Erickson, cashier of the Bank.

"Minot, North Dakota Oct. 18–04. In consideration of five hundred dollars to E. B. Page in hand paid the receipt whereof is hereby acknowledged, said E. B. Page agrees to sell to C. H. Parker six thousand five hundred dollars of the capital stock of the Minot National Bank of Minot, North Dakota, for the sum of eight thousand one hundred twenty-five dollars, said sum to be paid upon the delivery of said stock to C. H. Parker, provided, nevertheless, that the said C. H. Parker will buy at the same figure $500. of the capital stock of said bank from R. H. Hackett, and $500. from J. Y. Hull, and $3000. from A. H. Noltimier and $3000. from C. T. Studness; if this deal is closed by the 15th of November, then this five hundred dollars to apply as part payment on the $8125. but should C. H. Parker fail in any of the agreements set forth, then the said $500 is to be forfeited as damages to said E. B. Page.

"[Signed] E. B. Page, C. H. Parker, by J. E. Erickson."

At the time this contract was entered into, although not known to Page, Erickson was not authorized to purchase the shares at $125 per share, or to enter into the contract on behalf of Parker. After the making of this agreement Erickson executed and delivered to defendant the draft of the Bank on its correspondent the First National Bank of Minneapolis, Minn., for $500. It appears from the evidence the account of Parker with the bank was at this time overdrawn, but this sum of $500 was charged against said account on the following day.

On October 27th, thereafter, defendant revisited the Bank, delivered certificates for 50 shares of his stock, and received the check of Parker

for $6,875 in payment therefor, which check was afterwards paid on presentation. At this time Mr. Noltimier was present in the Bank with defendant and Erickson with a certificate for 20 shares. There was some controversy whether he was to receive $125 or $120 per share for the stock. However, the sum of $125 per share was agreed on as the price, and his certificate for the 20 shares was indorsed in blank and left at the Bank, as Erickson informed him it was not then known to whom it would go. At this time defendant tendered his resignation as a director of the Bank, which was accepted at a meeting of the board of the Bank on October 29th. Thereafter, on November 2d, Erickson wrote defendant, as follows, on the letter head of the Bank:

"Minot, N. D., 11-2-04.

"E. B. Page, Esq., Leeds, N. D.

"Dear Sir: If you will send up your other $1,000. stock in the Minot Nat. Bank we will remit by return mail for same at $1.25 as per agreement try to send it up tomorrow if possible we would like to have it here by to-morrow night if possible.

"Yours truly,          J. A. Erickson."

In response to this letter defendant replied, as follows:

"Leeds, North Dakota, 11-12-1904.

"Mr. J. A. Erickson, Minot, N. D.

"Enclosed please find One Thousand dollars of Minot Nat. stock of E. B. Page and five hundred of same stock of J. Y. Hull and five hundred of same stock of R. H. Hackett for which you will please remit to me.... $2,500 00
Less contract money................................... $500.
 " Bank fets......................................... 100.
 " 4 sav. bks........................................ 4.
                                                      ——  604 00

Total due me.......................................... $1,896 00

"Please send me draft for same.

"With best wishes for your continued prosperity and success I am, as ever, your friend,          E. B. Page."

In response Erickson on November 14th forwarded to defendant the draft for $1,896, which was paid. It is this sum of $2,500 so paid for which this action is brought.

An examination of the stock register and stock ledger of the Bank show all the 65 shares of stock sold by defendant on his own account to Parker through the agreement made with Erickson were transferred on the books of the Bank to Parker. Thereafter, on January 1, 1905, there was a dividend of 15 per cent. declared and paid the shareholders of the Bank, Parker receiving his dividend on 75 shares, the same being 10 shares originally owned by him, and on the 65 shares sold him by defendant, aggregating $1,125.

On the 29th day of October, 1904, the day the check which he had theretofore given for $6,875 was presented for payment, there was deposited by Parker in his account with the Bank $2,000 in cash, and his promissory note for $5,800, out of which was paid the $500 theretofore charged against his account by Erickson, and the check for $6,875. The purchase price of the 10 shares of stock last delivered by defendant to Erickson was charged to the account of Parker on the books of the Bank, he giving his promissory note to the Bank on the

15th day of November, the day following that on which the draft for $1,896 was drawn.

The evidence further discloses while Erickson had, by the form of his agreement on behalf of Parker made with defendant, agreed to pay $125 per share for defendant's stock, there existed between Parker and Erickson the agreement that Erickson was to pay $5 per share of this agreed price; that the aggregate amount thus to be paid by Erickson of the purchase price, $325, was not paid by him personally, but was paid by the Bank, and charged to the account of profit and loss in the Bank. The stock ledger and register of the Bank do not show to whom the 10 shares of Hull and Hackett stock were transferred. The purchase price was charged to the account of J. A. Slocum, a director of the Bank. This charge created an overdraft in the account which was long afterward, but before the failure of the Bank, covered by the promissory note of either Slocum or his wife, and, although both are shown by the evidence to be financially responsible, this note remained among the uncollected assets of the Bank at the time this case was tried.

The Bank was closed by order of the comptroller September 10, 1905, and the plaintiff, G. W. Swords, was appointed receiver, and brought this action.

At the conclusion of the evidence for the plaintiff the court directed a verdict in favor of defendant, judgment was entered thereon, and plaintiff brings error.

The only question presented and relied on by plaintiff in error to work a reversal of the judgment rendered is the action of the trial court in directing a verdict for defendant. If, considering all the evidence found in the record, and the inferences naturally and logically flowing therefrom, there be found no evidence sufficient to uphold a verdict in favor of the plaintiff, had one been returned, or if the state of the case at the conclusion of the evidence was such that the trial court, in the exercise of a sound judicial discretion, would have felt impelled to set aside a verdict in favor of the plaintiff because not supported by the evidence, then the action of the court in directing a verdict for defendant was right, and must be sustained. McGuire v. Blount, 199 U. S. 142, 26 Sup. Ct. 1, 50 L. Ed. 125; Union Pacific Railway Co. v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619, 38 L. Ed. 434; Elliott v. Chicago, Milwaukee, etc., Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; Delaware, etc., Railroad v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Anderson County Commissioners v. Beal, 113 U. S. 227, 5 Sup. Ct. 433, 28 L. Ed. 966.

In determining the question presented for decision, it becomes necessary to examine the nature of the issue presented and the evidence found in the record in support of plaintiff's case.

The ground on which plaintiff predicates his right of recovery, as alleged in his declaration, is quite definite and certain. It is neither that defendant sold his shares through Erickson, cashier, to the Bank, in violation of the provisions of section 5201, Rev. St. (U. S. Comp. St. 1901, p. 3494), which, in substance, provides: No association shall be the purchaser of any shares of its capital stock unless the purchase be necessary to prevent loss upon a debt previously con-

tracted; nor that defendant practiced any fraud or deceit upon or made any misrepresentation of facts to Erickson, the purchaser, but it is that defendant, a director of the Bank, sold his shares to Erickson, who was cashier, and knowingly received payment therefor from funds of the Bank misappropriated by Erickson for that purpose. While the statute does prohibit any national banking association from becoming the purchaser of shares issued by it unless necessary to prevent loss upon a debt previously contracted, because such transaction would, in effect, work an impairment of its capital, prohibited by law, yet there is no prohibition resting on the cashier of such association which prevents him from becoming the purchaser or owner, of such shares, or from acting as the agent or representative of others desiring to either purchase or sell their shares. Mr. Justice Field, delivering the opinion of the court in Johnston v. Laflin, 103 U. S. 800, 26 L. Ed. 532, said:

"The transferability of shares in the national banks is not governed by different rules from those which are ordinarily applied to the transfer of shares in other corporate bodies. The power of attorney indorsed on the certificate is usually written or printed, with a space in blank for the name of the attorney to be inserted, for the accommodation of the purchaser. * * * The validity of a sale and its completeness must be determined by the relation which the contracting parties at the time openly bear to each other.

"Of course, the whole case here would be changed if the sale by Laflin had not been made in good faith, but was made merely to evade his just responsibility as a stockholder, or to work a fraud upon other stockholders or creditors of the bank."

Therefore, in order that plaintiff should show himself entitled to a recovery in this case, it is incumbent on him to prove defendant made a sale of his shares, or those of his associates, not through Erickson, as cashier of the Bank, to another, but to Erickson, cashier, individually; and also to further prove the payment of the purchase price was made by Erickson out of the funds of the Bank misappropriated and misapplied to that purpose, either with the actual knowledge of defendant or under such circumstances as would impute knowledge to him.

The question here presented is: Has the plaintiff by the evidence found in the record discharged the burden so assumed? As has been seen by the statement made, although the cashier, Erickson, was not authorized to bind Parker by the contract made with defendant for the purchase of his shares, and those of his associates, at $125 per share, yet, as he assumed to so act for Parker, defendant was justified in the belief he was making the sale to Parker, and not to Erickson. And, as Erickson possessed the power as an officer to bind the Bank to the payment of the draft for $500 drawn on its correspondent at the time this contract was entered into, there was nothing in that transaction which would impute notice to defendant that Parker was not purchasing the shares, or that Erickson was not representing him in the execution and delivery of the draft. At this time defendant, having, as he believed, concluded a sale of his stock to Parker, tendered his resignation as an officer of the Bank, and it is not shown he was thereafter familiar with its business affairs. When on October 27th defendant made delivery of certificates for 55 shares, properly

assigned, at the Bank, he received from Parker in payment his check for the full purchase price named in the contract of sale, $125 per share, which fact warranted him in believing the written contract of sale theretofore made, and its terms and conditions were known to and being performed by Parker. While the evidence does disclose there was a secret understanding between Parker and Erickson that Parker was to pay but $120 per share of the purchase price of defendant's stock, and that Erickson was to pay $5 per share of the purchase price of defendant's stock, or, in the aggregate $325, which was not paid personally by Erickson, but was paid by the Bank and charged to its profit and loss account; and while the evidence further shows the draft for $500 was in the first instance drawn on and paid out of the funds of the Bank, and although the certificates for the 20 shares last delivered were transmitted to Erickson and the account settled by draft drawn by him on funds of his Bank, yet in so far as the stock of defendant himself is concerned from the fact that an examination of the stock ledger and stock register of the Bank leaves no doubt that the defendant's stock was legally transferred on the books of the Bank to Parker, and from the further fact that thereafter Parker received the dividend declared by the Bank on the full number of shares sold by defendant on his personal account, as stock purchased by him from defendant, which fact would estop him from contending as against any one claiming through the Bank that he was not the purchaser and owner thereof, we are inclined to the opinion there is no sufficient evidence found in the record to have warranted the jury in finding any part of defendant's shares was sold to Erickson on his individual account and not to Parker, and, of necessity, knowledge of that which did not exist cannot be imputed to defendant.

In so far as the 10 shares owned by Hull and Hackett are concerned, the case is less clear, for the books of the Bank fail to disclose who purchased these shares or to whom they were transferred on the books if at all. From the fact, as appears from the evidence, that the purchase price of these shares was charged to the account of Slocum, a depositor in and director of the Bank, on the same date the purchase price of ten other shares was so charged, which charge created an overdraft in that account, and from the manner in which this overdraft was carried on the books until covered by the uncollected promissory note of Slocum or his wife, small margin for doubt remains but that Erickson, the cashier, was dealing in the shares with the funds of the Bank. However, the question here presented as to the liability of defendant must be determined not so much by the actual state of the facts as by what defendant either knew or should have known from all the circumstances surrounding the sale. And in determining this question the entire stock transaction had by defendant with Parker or with or through Erickson must be viewed as a whole. And, thus viewed, the question is: Does the record contain any sufficient evidence to sustain a finding that defendant knew or had reasonable cause to believe he was disposing of the Hull and Hackett shares to Erickson, and that payment therefor was being made by him from the funds of the Bank in violation of the law?

As has been seen from all the evidence, defendant undoubtedly believed he was disposing of his own shares to Parker, and, had any suspicious circumstance which occurred put him on inquiry as to the true state of the case, an examination of the books of the Bank, an interview with Erickson, or even information solicited from Parker himself, would have but confirmed his belief in this respect. At the time Erickson wrote defendant to forward his remaining 10 shares no mention was made in the letter of the Hull and Hackett shares. Although at this time defendant knew the contract he had made with Parker through Erickson for the sale of all the shares of himself and his associates was not authorized by or binding on Parker, yet Parker had apparently acquiesced therein, and, in so far as indicated by appearances, was carrying out that contract as to defendant's personal shares. Erickson had informed defendant he could not purchase and did not intend to purchase any shares because not financially able; that he desired the shares purchased and held in Minot, the home of the Bank; that certain citizens of that place, including Slocum, would purchase the shares. In this state of affairs, although not requested by Erickson in his letter, yet in response thereto, defendant inclosed the Hull and Hackett certificates as well as his own undelivered shares and requested Erickson to forward a draft to balance the account as stated therein, which was done, and the transaction closed.

Can it be said this state of facts furnished evidence of a sale by defendant of the Hull and Hackett shares to Erickson, or furnished such reasonable grounds for so believing as should have put defendant on inquiry into the true state of the facts? If, so, what would such inquiry have disclosed? While an examination of the records of the Bank would have shown a regular transfer of defendant's individual shares to Parker, they would not have shown any transfer of the Hull and Hackett shares to any one. The books of account in the Bank would have shown the purchase price of defendant's personal shares transmitted with the Hull and Hackett certificates, charged to the account of Parker, and the purchase price of the Hull and and Hackett shares charged to the account of Slocum, and presumably with his knowledge and consent, as he was not only a depositor with but an officer of the Bank, and a man of affairs. This charge was thereafter acquiesced in by him because it was covered by the promissory note of himself or wife.

In the light of these facts, and all other facts and circumstances in evidence in this case, aided by the presumption that Erickson, an officer of the Bank, would have been presumed, by any one making an investigation, to have acted neither in violation of the law in purchasing the shares on his own account with funds embezzled from the Bank, nor to have charged the purchase price of the shares to the account of a depositor and director of the Bank without authority to so do, we are inclined to the opinion on the whole case the direction of the trial court to return a verdict in favor of defendant was right, and must be affirmed.

It is so ordered.