**TAYLOR v. SPURWAY et al.**

No. 1204.

District Court, S. D. Florida. Miami Division.

Sept. 4, 1936.

W. H. Burwell, Marion E. Sibley, E. B. Kurtz, and William L. Reed, all of Miami, Fla., for plaintiff.

Carl T. Hoffman, L. L. Robinson, and A. J. Rose, all of Miami, Fla., and George P. Barse and Charles E. Wainwright, both of Washington, D. C., for defendants.

STRUM, District Judge.

Plaintiff, Henry H. Taylor, was appointed receiver of City Trust Company by a Florida state court on May 8, 1931. As such receiver, by authority of that court, he sues C. H. Bancroft, who succeeded H. J. Spurway as receiver of City National Bank in Miami, and others, to recover $200,000 which plaintiff alleges was fraudulently transferred from capital, surplus and undivided profits of City Trust Company to the stockholders of said City Trust Company by means of a pretended sale of the capital stock of said trust company to the Administrator Company, a dummy corporation, which used as the purchase price of said stock the same $200,000 in cash theretofore extracted from the capital assets of City Trust Company, which money plaintiff charges should be restored to City Trust Company for the benefit of its creditors. The cause is now on final hearing.

City Trust Company, a Florida corporation, was organized early in 1927 for the purpose of taking over the trust business of City National Bank & Trust Company. On March 3, 1927, City National Bank & Trust Company conveyed all its trust assets to the newly organized City Trust Company, and the latter assumed the trust liabilities of the former. City National Bank & Trust Company then merged with and changed its name to City National Bank in Miami.

The trust business carried on by City Trust Company prospered and it was in sound condition up to the time of the transactions of which plaintiff complains.

City National Bank in Miami closed, and Spurway was appointed receiver, December 20, 1930.

The authorized capital stock of City Trust Company was 1,000 shares, par value of $100 each, for which the original stockholders paid $150 per share, thus affording a capital of $100,000 and a surplus of $50,000 at organization. Immediately prior to the transactions here in question, the stock of City Trust Company was owned, as follows: 880 shares by City National Bank in Miami, of which Spurway was receiver; 120 shares by 12 individuals, including Morgan S. McCormick, who owned 10 shares each.

City National Bank & Trust Company paid for its shares in cash or its equivalent. Of the 12 individual stockholders, some paid for their stock in cash from their individual funds; others, amongst whom are the defendants McCormick, Gordon, Oliver, and Roberts, paid by borrowing $1,500 each from City National Bank & Trust Company, for which they each gave their notes, secured by their 10 shares of stock in City Trust Company. Due to interlocking directorates and the above-mentioned stock ownerships, City National Bank in Miami completely dominated City Trust Company.

Guardian Trust Company was organized about August, 1930. It had a total authorized capital of 1,000 shares, par value of $100 per share, which was sold for $150 a share, giving it a capital of $100,000 and $50,000 surplus. This corporation had only two actual stockholders. The J. C. Penny-Gwynne Corporation purchased one-third of the stock, paying $50,000 therefor. The other two-thirds of the stock of Guardian Trust Company was ostensibly purchased by certain directors of City Trust Company, including McCormick, who executed their promissory notes payable to City Trust Company, six for $15,000, and one for $10,000, aggregating $100,000, secured by capital stock of Guardian Trust Company, on which notes City Trust Company advanced to Guardian Trust Company said aggregate sum of $100,000. This two-thirds of the capital stock of Guardian Trust Company was in fact paid for and owned by City Trust Company, in whose name it was carried on the books of Guardian Trust Company. City National Bank in Miami, and thereafter its receiver, Spurway, dominated City Trust Company by the former's ownership of 880 shares of capital stock of the latter, and the interlocking directorates; and City Trust Company in turn dominated and controlled Guardian Trust Company by reason of City Trust Company's ownership of two-thirds of the capital stock of Guardian Trust Company, and interlocking directorates of the three corporations. So Spurway, as receiver of City National Bank, really dominated and controlled both City Trust Company and Guardian Trust Company.

For a year or more prior to December 12, 1930, Morgan S. McCormick had been president of City Trust Company, and was also a director in or otherwise connected with City National Bank and Guardian Trust Company. On the last-named date

he resigned as president of City Trust Company. He was intimately familiar with the affairs of City Trust Company, Guardian Trust Company, and City National Bank in Miami.

McCormick and associates wished to acquire Guardian Trust Company, but Spurway refused to dispose of Guardian unless he could also dispose of City Trust Company at the same time. McCormick set out to meet these requirements in the following manner.

On January 5, 1931, McCormick, on behalf of himself and certain "friendly interests," submitted an offer to Spurway as receiver of City National Bank, to purchase the 880 shares of City Trust Company then owned by City National Bank, at $200 per share. The annual stockholders' meeting of City Trust Company, due to be held on January 8, 1931, was adjourned by Spurway as majority stockholder from time to time, so that he could secure the Comptroller's approval of the sale to McCormick. Approval having been secured, the adjourned annual stockholders' meeting of City Trust Company was finally held in the Directors' Room of City National Bank at 10 a. m., January 20, 1931.

Meanwhile, H. B. Oliver, who was then a stockholder and director of City Trust Company and a former employee of Spurway in City National Bank, at the request of either Spurway or McCormick, or both, had advised the other individual stockholders of City Trust Company that their stock could be sold for $200 per share in conjunction with the sale of Spurway's stock, to which all the individual stockholders assented, and all of them, including McCormick, indorsed their shares either in blank, or direct to Spurway, and delivered same to Oliver to sell. Oliver delivered these 120 shares, including his own 10 shares and McCormick's 10, to McCormick on January 21, 1931, receiving therefor from McCormick Guardian Trust Company's check for $24,000, payable to H. B. Oliver, as agent, which will be again mentioned later.

Administrator Company was a corporation organized January 10, 1931 by McCormick, to be used as a conduit through which to handle the projected purchase of the stock of City Trust Company. It was purely a dummy corporation. It had no assets, no cash, and no paid in capital.

At the adjourned annual stockholders' meeting of City Trust Company held in the Directors' Room of City National Bank at 10 a. m., January 20, 1931, Spurway was present, holding and voting the 880 shares owned by City National Bank. Spurway's attorney was present, also McCormick and some of his associates. The minutes of the meeting recite that Gordon and Oliver, two original stockholders of City Trust Company were present, but Gordon and Oliver deny that they were present.

Spurway voted his 880 shares (and 10 shares as proxy for F. M. Hudson, who was not present) to elect a new board of directors of City Trust Company, composed of persons designated by McCormick.

On January 20, 1931, at 10:15 a. m. the new directors of City Trust Company, consisting of McCormick's nominees, convened and transferred to Guardian Trust Company $239,780.64 of City Trust Company's trust assets. Apparently Guardian Trust Company, by resolution of its directors, later assumed City Trust Company's trust liabilities in that amount. The new board of directors of City Trust Company also purported to sell to Guardian Trust Company $154,695.83 of the loans, discounts, and real estate mortgages then owned by City Trust Company, and which constituted all its remaining assets except cash on deposit in First National Bank, for which Guardian Trust Company paid the sum of $79,619.33 in cash, and executed for the remainder of the purchase price its promissory notes payable to City Trust Company in the sum of $75,076.50. The board of directors of City Trust Company then passed resolutions declaring City Trust Company in voluntary liquidation, and adjourned.

At about 12:30 noon, January 20, 1931, the then directors of Guardian Trust Company met. They resigned one at a time and were replaced by nominees of McCormick. McCormick was the only old director of Guardian Trust Company who did not resign. As each of the old directors of Guardian Trust Company resigned, the remaining directors elected McCormick's nominees in place of the resigned directors. This continued until all the old directors, except McCormick, had resigned, and new directors of McCormick's nomination had taken their place. The personnel of the directors of City Trust Company and Guardian Trust Company was then identical.

The above-mentioned sum of $79,619.33 in cash was immediately deposited to the credit of City Trust Company in First Na-

tional Bank of Miami—another bank entirely, and not associated with any of the three banks or trust companies here involved. At the time of said deposit City Trust Company had other funds on deposit in First National Bank of Miami in the sum of $85,380.67. A part of the last-mentioned sum was obtained from Spurway, who on January 17, 1931, had drawn his receiver's check for $8,799.86, payable to City Trust Company, which check came into the hands of the new directors of City Trust Company and was deposited to the account of that company in First National Bank of Miami about January 20, 1931.

At about 1.30 p. m. on January 20, 1931, the new stockholders of City Trust Company (McCormick and associates) met and ratified the resolution of the new board of directors (McCormick and associates), declaring City Trust Company in voluntary liquidation. Spurway did not appear of record at this meeting. Instead, the minutes show that "R. H. Buss (who was also a new McCormick director in Guardian Trust Company) as proxy representing the Administrator Company," attended and voted 950 shares, as did also McCormick, and his designees as directors, R. C. Fenters, Amos Travis, O. W. Gustus, and the same R. H. Buss, each of whom individually voted 10 shares, apparently a part of the 120 shares formerly held by the original individual stockholders of City Trust Company. A liquidating dividend in the sum of $240,076.50, representing all then remaining assets of City Trust Company, was then declared to Administrator Company.

This liquidating dividend was in the following form:

| | |
|---|---|
| Check of City Trust Company, payable to Administrator Company, drawn on First National Bank, | $156,200.14 |
| Check drawn on First National Bank by City Trust Company, payable to Administrator Company, | $ 8,799.86 |
| Notes given by Guardian Trust Company, payable to City Trust Company, in the sum of | $ 75,076.50 |
| Total | $240,076.50. |

The two above-mentioned checks so delivered to Administrator Company, and payable to it, were labeled "Stockholders' Liquidating Dividends." The promissory notes in amount of $75,076.50, given by Guardian Trust Company, payable to City Trust Company, were by the latter indorsed to Administrator Company.

The above-mentioned check for $8,799.86, duly indorsed by Administrator Company, was deposited in First National Bank to the credit of City Trust Company and formed a part of the $176,000 later paid Spurway by the Escrow Department of First National, the escrow amount consisting of $156,200.14, plus $8,799.86, plus $11,000 cash.

In order to raise the full $200,000 necessary to buy all the stock, Administrator Company procured a check from Guardian Trust Company, payable to H. B. Oliver, for $24,000, hereinabove mentioned, for which it surrendered to Guardian Trust Company, marked paid, $24,000 of the promissory notes given by Guardian Trust Company to City Trust Company, and indorsed by City Trust Company to Administrator Company as part of the liquidating dividend.

The remaining $11,000 necessary to make up the $200,000 purchase price of the stock was borrowed by McCormick from his associates, and on January 21, 1931, this $11,000 was repaid by McCormick and the Administrator Company, as follows: Administrator Company pledged $11,000 of the notes of Guardian Trust Company, which it had received as part of the liquidating dividend, to First National Bank, and the latter bank loaned $11,000 to Administrator Company, which in turn repaid the loan made to McCormick by his associates. Subsequently Guardian Trust Company paid the $11,000 and the pledged notes above mentioned were returned to it.

On January 20, 1931, Administrator Company, City Trust Company, and Guardian Trust Company directed a letter to First National Bank of Miami, Escrow Department, delivering to it two checks totaling $165,000 (the $156,200.14 and $8,799.86 checks above mentioned), which had been received by Administrator Company as part of the liquidating dividend, together with the aforesaid $11,000 in cash raised as above stated. The escrow letter directed First National Bank to deliver to Spurway, as receiver of City National Bank in Miami, said sum of $176,000 "when there has been delivered to you for our account 880 shares of the capital stock of City Trust Company, par value $100 per share, endorsed for delivery."

About 2 o'clock on the afternoon of January 20, 1931, in the Directors' Room of City National Bank, First National Bank's Escrow Department, acting through Mr. Stiles, delivered to Spurway a deposit ticket, dated January 21, 1931, in the sum of $176,000, showing an unconditional deposit of that sum in First National Bank to the credit of Spurway, whereupon the escrow agent received from Spurway and delivered to McCormick 880 shares of City Trust Company, indorsed in blank. This $176,000 was made up of (1) a check of Administrator Company drawn on First National Bank for $156,200.14, payable to Administrator Company and indorsed by it; (2) Spurway's check as receiver, payable to City Trust Company, $8,799.86; and (3) $11,000 in cash, furnished by McCormick from outside sources. The above-mentioned $156,200.14 was part of the so-called liquidating dividend declared by City Trust Company to Administrator Company, which dividend was made up of $79,619.33 received by City Trust Company from Guardian Trust Company for the loans and discounts sold by the former to the latter; plus other cash of City Trust Company already on deposit with First National Bank of Miami, aggregating $85,380.67, in which latter sum was included the above-mentioned check procured from Spurway for $8,799.66. After banking hours on January 20, 1931, Spurway demanded, and received from First National Bank, a Federal Reserve Exchange in the sum of $176,000, payable to Citizens & Southern National Bank of Atlanta, Ga., which was remitted on the same afternoon by Spurway to the depositary in Atlanta, thus augmenting the receivership estate by that amount.

During the afternoon of January 21, 1931, Guardian Trust Company issued to H. B. Oliver, a former director of City Trust Company, its check for $24,000, already mentioned, and Oliver delivered the 120 individual shares of City Trust to McCormick. As consideration for the $24,000 so paid to Oliver, Administrator Company surrendered to Guardian Trust Company, marked paid, $24,000 of the latter's notes held by Administrator Company as part of the liquidating dividend. These funds were later distributed by defendant Weissbuch, at the request of Oliver, to the several individual stockholders, each receiving the benefit of $2,000, or $200 per share for their 10 shares of capital stock of City Trust Company.

After paying the $200,000 purchase price of the stock of City Trust Company, Administrator Company still held $40,076.50 of Guardian Trust Company notes which the latter had given City Trust Company in part payment of the assets purchased as already stated. Of these, $1,000 was returned by Administrator Company to City Trust Company as a fund out of which to meet contingent liabilities.

The net result of this series of transactions was that the assets of City Trust Company were used to purchase its own capital stock, leaving certain creditors unpaid as hereinafter stated; City Trust Company's trust liabilities in amount of $239,780.64 were shunted to Guardian Trust Company, to whom was also transferred a like amount of City Trust Company's assets; City Trust Company was retired from further operation, its stockholders receiving for their stock $200 per share in cash derived from funds extracted from the assets of City Trust Company; its trust creditors compelled in invitum to thereafter look to Guardian Trust Company for settlement; and open creditors left unpaid; either Administrator Company or Guardian Trust Company would receive the benefit of City Trust Company's remaining assets, which were of a book value of about $39,000 to $40,000; and McCormick and his associates by acquiring through Administrator Company all the capital stock of City Trust Company, came into the ownership of two-thirds of the capital stock of Guardian Trust Company then owned by City Trust Company, McCormick's ultimate objective in the whole matter being to acquire control of Guardian Trust Company, and Spurway's objective being to dispose of his stock in City Trust Company for $200 per share, cash. All this was accomplished by the above-described manipulation of the assets and affairs of City Trust Company and Guardian Trust Company, aided only by a check for $8,799.66 procured from Spurway as receiver, and the $11,000 raised by McCormick from outside sources.

These activities and transactions were carried out by McCormick and his associates with the willing and active assistance and co-operation of Spurway, who participated with full knowledge of the details of the entire transaction. The court is convinced, and finds, that Spurway well knew all along what was on foot, and the objectives to be attained.

As to the remaining eleven individual stockholders of City Trust Company, namely, F. M. Hudson, Hugh Gordon, Jr., H. B. Oliver, S. D. Weissbuch, S. M. Tatum, Richardson Saunders, C. D. Leffler, Harry Roberts, Charles E. Briggs, Burdette G. Lewis, and William J. Weller, as administrator, the court is convinced, and finds, that none of them had any culpable part in the transactions above related; and that none of them knew who would be the purchaser of their stock, nor the source of the purchase money, although some of them attempted, without success, to find out. They had no guilty knowledge of what was on foot, nor are they guilty of any indifference to the true state of affairs from which culpable ignorance or fraud could be imputed. These eleven individual stockholders simply thought they were making a bona fide sale of their stock in connection with the purchase of the Spurway-controlling interest by outside persons who were not yet ready to disclose their identity. The court exonerates them from any charge of conscious fraud.

The transactions above related left City Trust Company without assets of any kind, except $1,000 in notes just mentioned. At that time City Trust Company had liabilities, actual or potential, other than trust liabilities, arising from transactions prior to January 20, 1931, as follows:

| | |
|---|---|
| Open liabilities now adjudicated | $ 8,507.81 |
| Sundry unadjudicated claims | $ 3,394.00 |
| Contested and unadjudicated claims | $112,875.00 |
| Total | $124,776.81 |

At the time the testimony was taken the receiver of City Trust Company still owed trust liabilities in the sum of $83,003.70; the above-mentioned adjudicated open claims in the sum of $8,507.81; and miscellaneous unadjudicated claims aggregating $3,394, besides contested and unadjudicated claims of $112,875—a total of $207,780.51. The receivership now holds assets of the book, but not actual, value of $98,025.72, secured from a division of assets between Guardian Trust Company and City Trust Company on October 12, 1931, following a decision by Supreme Court of Florida (State ex rel. Landis v. Circuit Court, 102 Fla. 122, 135 So. 870) that the receiver judicially appointed for Guardian Trust Company was improperly appointed. Neglecting the contested and unadjudicated claims of $112,875, there is an apparent excess of assets (at book value) over liabilities of $3,120.22. But the actual value of these assets is speculative and undetermined, and it is by no means certain they will produce their book value in money. In fact it is quite doubtful. If the contested and unadjudicated claims become an actual liability, the situation will be that much worse. The court therefore finds that after the liquidating dividend was used to purchase the stock of City Trust Company, the company was insolvent, and that sufficient funds are not available in the receivership of City Trust Company to pay its creditors.

Looking through the artifice of form to the substance of these transactions, the payment of the so-called "liquidating dividend" was in essence nothing more than a purchase of the capital stock of City Trust Company with its own assets. As matters now stand, all stockholders of City Trust Company have received $200 per share for their stock in cash extracted from corporate assets, while creditors remain unpaid to the extent above stated, the assets available to pay the remaining indebtedness being apparently insufficient.

The capital stock of a corporation is a trust fund for the payment of its debts, in the sense that when the corporation is dissolved and its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof amongst the stockholders. As regards creditors, there is no distinction in this respect between capital stock and other assets. If diverted, its assets may be followed by its creditors as far as they can be traced, and restitution will be decreed in equity except as against bona fide purchasers for value and without notice. Sanger v. Upton, 91 U.S. 56, 23 L. Ed. 220; Wabash v. Ham, 114 U.S. 587, 5 S.Ct. 1081, 29 L.Ed. 235; Sawyer v. Hoag, 17 Wall.(84 U.S.) 610, 21 L.Ed. 731; Hayden v. Thompson (C.C.A.) 71 F. 60, 63; Hamor v. Taylor-Rice Engineering Company (C.C.) 84 F. 392, 396; Beach v. Williamson, 78 Fla. 611, 620, 83 So. 860, 863, 9 A.L.R. 1438; 33 Am.St.Rep. 344; Crandall v. Lincoln, 52 Conn. 73, 52 Am.Rep. 560 (a portion of the opinion is omitted in Am.Rep.).

In Scammon v. Kimball, 92 U.S. 362, 367, 23 L.Ed. 483, it is said that when the assets of a corporation have been "improperly distributed among the stockholders,

* * * the established rule in equity is, if the debts of the company remain unpaid, that such [stock] holders take the fund charged with the trust in favor of the creditors, which a court of equity will enforce, and compel the application of the same to the satisfaction of the debts of the corporation." See, also, Scoville v. Thayer, 105 U.S. 143, 152, 26 L.Ed. 968, 972.

■ Courts of equity are astute to detect and defeat any scheme or device which is calculated to withdraw the capital or other assets of a corporation for the benefit of stockholders to the prejudice of creditors. Transactions of the character shown by the evidence in this case between two corporations dominated by the same directors and stockholders are well calculated to arouse suspicion. They merit rigid and severe scrutiny when questioned by creditors or their representatives.

Section 6138, C.G.L.Fla.(1927) provides: "No trust company shall make any loan on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith, and stock so purchased or acquired shall within one year from the time of its purchase be sold or disposed of at public or private sale." Cf. Hayes v. Belleair Co., 120 Fla. 326, 162 So. 698, 699.

On the former appeal from Judge Ritter's ruling in this case, the Circuit Court of Appeals, 72 F.(2d) 97, 99, said: "The bill makes a case for the setting aside of the entire transaction and the restoration of the status quo ante. It is possible that the final judgment should take that form to do equity between the parties." The evidence abundantly supports the allegations of the bill.

The court doubts that either Spurway or McCormick intended to actually defraud the creditors of City Trust Company. Quite irrespective of their personal intentions and motives in the matter, however, their activities were in fraud of the rights of creditors of City Trust Company. Their transactions undoubtedly resulted in placing their interests as stockholders ahead of the rights of creditors. It is true that assets of City Trust Company were conveyed to Guardian Trust Company in amount sufficient to theoretically pay the trust creditors of City Trust Company. But it has not worked out that way in fact, and wheth-

er or not it will is speculative and doubtful. There were no open claims shown by the books of City Trust Company on January 20, 1931. But open claims in a substantial amount, which were subsequently adjudicated to exist at that time, and others asserted but still unadjudicated, were not provided for, except to the insufficient extent of $1,000 in notes of Guardian Trust Company, already mentioned, set aside by City Trust Company to meet "contingent" liabilities.

■ Even if there had been only trust liabilities, these have not yet been paid. The trust creditors are entitled to look to City Trust Company and its assets until actually paid. They cannot be compelled in invitum to accept Guardian Trust Company as a substitute debtor. The creditors of City Trust Company must be paid in fact, and not simply referred to another debtor, however solvent, before stockholders of City Trust Company are entitled to liquidate their stock from company assets. Clearly Spurway and McCormick, who had full knowledge of the facts and who were the primary actors in these transactions, cannot retain the moneys they have thus received, as against the unpaid creditors of City Trust Company. By reason of their activities aforesaid, the $176,000 received by Spurway, as receiver of City National Bank in Miami, and the $2,000 distributed for the benefit of McCormick under his direction, were received by them impressed with a trust ex maleficio, which created a lien in favor of Taylor, as receiver of City Trust Company, representing the creditors of the latter company. Cf. Hyams v. Calumet Co. (C.C.A.) 221 F. 529.

The estoppels urged by Spurway against restoration of the status quo ante are not tenable. They afford no sufficient bar to relief in equity from the consequences of fraud practiced on creditors of City Trust Company.

■ As to the individual stockholders other than McCormick, namely, F. M. Hudson, Hugh Gordon, Jr., H. B. Oliver, S. D. Weissbuch, S. M. Tatum, Richardson Saunders, C. D. Leffler, Harry Roberts, Charles E. Briggs, Burdette G. Lewis, and William J. Weller, as administrator, the court finds that they are free from any conscious fraud or wrongdoing in these transactions. They are, however, the beneficiaries of Spurway's and McCormick's activities. After all, the funds which purchased their stock came directly, though in

masked form, from the assets of City Trust Company, to the prejudice of the creditors. With the benefits, they must share the consequences of Spurway's and McCormick's activities. Innocent though they are of any conscious fraud, they cannot in equity be permitted to retain the benefit of funds secured by fraud practiced upon the creditors, of which these individual stockholders were the beneficiaries, even though they had no knowledge of the source from which the funds came when they accepted them and parted with their stock. Stockholders are conclusively charged with notice of the trust character of their stock. They therefore cannot become bona fide purchasers of corporate property or funds transferred to them to the prejudice of creditors in payment for their own stock. The rights of creditors cannot be defeated by the fact that at the time the sale was consummated, the stockholder was acting in good faith and supposed the corporation was solvent. The money with which the stock of the individual stockholders was purchased was tainted by the fraudulent activities of Spurway and McCormick. As fraud vitiates everything it touches, the transaction should be set aside and the status quo ante restored as to the individual stockholders, as well as Spurway and McCormick. Crandall v. Lincoln, 52 Conn. 73, 52 Am.Rep. 560; 33 Am.St.Rep. 344; Commercial Nat. Bank v. Burch, 141 Ill. 519, 31 N.E. 420, 33 Am.St.Rep. 331, 334; Clapp v. Peterson, 104 Ill. 26; In re Fechheimer Fishel Co. (C.C.A.) 212 F. 357, 363.

Johnston v. Laflin, 103 U.S. 800, 26 L. Ed. 532, and Swords v. Page (C.C.A.) 174 F. 916, relied upon by certain defendants, are not in point.

Since, however, on motion of plaintiff, the cause was dismissed on June 6, 1935, as to defendants Richardson Saunders, Harry Roberts, Charles L. Briggs, Hugh Gordon, Jr., Burdette G. Lewis, and William J. Weller, as administrator, because said defendants had not been served with process, no relief will be awarded in the final decree as against the parties last named.

The plaintiff receiver is entitled to an accounting from all remaining defendants to the extent necessary to accomplish the restoration above stated.

The set-off claimed by defendant Weissbuch for compensation allowed him by the state court for services rendered to City Trust Company prior to its receivership cannot be allowed, for the reason, amongst others, that even if it is a proper subject of set-off herein, to allow it as such would afford Weissbuch an undue preference over other creditors of City Trust Company of like class as himself. His right to priority, if any, should be settled by the state court.

Decree for plaintiff.